1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
9                  AT TACOMA

10  LARRY W. CASON,

11                  Plaintiff,                    CASE NO.    C04-5730RBL

12       v.                                       REPORT AND
                                                  RECOMMENDATION
13  JO ANNE B. BARNHART, Commissioner of          Noted for December 2, 2005
    Social Security,
14
                    Defendant.
15

16

17        Plaintiff, Larry W. Cason, has brought this matter for judicial review of the denial of his applications

18  for disability insurance and supplemental security income ("SSI") benefits.  This matter has been referred to

19  the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR

20  4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After

21  reviewing the parties' briefs and the remaining record, the undersigned submits the following report and

22  recommendation for the Honorable Ronald B. Leighton's review.

23                          FACTUAL AND PROCEDURAL HISTORY

24        Plaintiff currently is fifty-eight years old.[1] Tr. 38.  He has a twelfth grade education and some

25  vocational training in welding. Tr. 68.  He has past work experience as a cashier/stocker and grocery clerk

26  cashier. Tr. 18, 58.

27  _____

28        [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
    to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

Plaintiff protectively filed his applications for disability insurance and SSI benefits on November 5, 1995, alleging disability as of June 1, 1995, due to back problems. Tr. 27-29, 50, 163, 305. Both of his applications were denied initially and on reconsideration. Tr. 38-39, 46-47, 50-51. Following a hearing, administrative law judge ("ALJ") Marguerite Schellenberger issued a decision on September 12, 1997, in which she found plaintiff not disabled. Tr. 163-69. That decision, however, was remanded by the Appeals Council for further review of the evidence on March 9, 1999. Tr. 186-88.

On remand, a new hearing was held before a different ALJ, who issued a decision on July 5, 2000, again finding plaintiff not disabled. Tr. 305-32. Once more, however, on December 7, 2001, the matter was remanded by the Appeals Council for additional review of and to further develop the evidence in the record. Tr. 283-84. On the second remand, another hearing was held before ALJ Schellenberger, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 397-437.

On September 30, 2003, ALJ Schellenberger issued a decision again determining plaintiff to be not disabled, finding in relevant part as follows:

(1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had "severe" impairments consisting of lumbar spine degenerative disc disease, a pain disorder associated with a general medical condition and a personality disorder;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)    at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded him from performing his past relevant work; and

(5)    at step five, (i) plaintiff became disabled as of September 12, 2002, when he attained the age category of advanced age (as defined in the Social Security Regulations), and (ii) prior thereto, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 24-25. Plaintiff's request for review was denied by the Appeals Council on September 3, 2004, making the ALJ's decision the Commissioner's final decision. Tr. 7; 20 C.F.R. §§ 404.981, 416.1481.

On October 29, 2004, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1). Specifically, plaintiff argues the ALJ's decision finding him not disabled prior to September 12, 2002, should be reversed and remanded for an award of benefits for that period because:

(a)     the ALJ erred improperly rejected the opinion of plaintiff's treating physician;

(b)     the ALJ's assessment of plaintiff's residual functional capacity is not supported by substantial evidence;

(c)     the ALJ erred in evaluating plaintiff's credibility; and

(d)     the testimony of the vocational expert is invalid.

While the undersigned agrees that the ALJ erred in finding plaintiff not disabled, for the reasons set forth below, this matter should be remanded for further administrative proceedings.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ Properly Evaluated the Opinion of Plaintiff's Treating Physician

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

1   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

2   Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

3   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

4        The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

5   either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

6   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

7   legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

8   ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

9   F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

10  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

11  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

12       In general, more weight is given to a treating physician's opinion than to the opinions of those who

13  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

14  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

15  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

16  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

17  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

18  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may

19  constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

20  31; Tonapetyan, 242 F.3d at 1149.

21       In mid-March 1997, plaintiff was referred by Dr. Roger D. Olsen, his treating physician at the time,

22  to Dr. Donna L. Frankel, a rehabilitation medicine specialist, for an evaluation of and recommendations

23  regarding management for his back pain. Tr. 118.  On examination, he was noted to be "uncomfortable with

24  movements" and to sit "stiffly." Tr. 126.  His gait also was stiff and uncomfortable. Id.  He was not able to

25  tandem walk, and could heal and toe walk, but with pain. Id.  He also had "minimal lift of leg and foot off

26  floor," which he was "unable to maintain [for a] few seconds without support." Id.  Plaintiff had tenderness

27  to palpation in his spinous processes and the paraspinal muscles in his lower back. Id.  Range of motion in

28  his lumbar spine was "[m]arkedly limited" and "associated with pain." Id.  On the other hand, he his deep

1  tendon reflexes were equal, and his strength, sensation and coordination were all intact. Id.

2      Dr. Frankel assessed plaintiff as having, among other things, chronic pain syndrome, low back pain,

3  right lower extremity pain, headaches, lumbar or lumbosacral intevertebral disc degeneration, impaired gait,

4  and a sleep disorder. Tr. 118-19.  With respect to the chronic pain syndrome, Dr. Frankel stated that the

5  significant physical examination findings included plaintiff's "markedly restricted lumbar" range of motion,

6  "marked" kyphosis, impaired balance, and "pain inhibition of selected muscle groups." Tr. 118.  By

7  plaintiff's report, his low back pain had been present at a "low level" since 1995. Id.  Dr. Frankel felt his

8  "mechanical/postural dysfunction" was "a major contributor" to his headaches. Tr. 119.  She found he had

9  "[d]ifficulty with gait and balance secondary to pain and it's secondary complications," and "marked

10 impairment of sleep" secondary to his chronic pain problem. Id.

11     Dr. Frankel concluded that plaintiff was "[n]ot currently employable because of the complications of

12 chronic pain as noted in the multiple other problems discussed" in her report. Id.  It is this opinion that

13 plaintiff argues the ALJ improperly rejected.  While the ALJ did not expressly reject that opinion, though

14 mention of the 1997 evaluation was made in her decision, the ALJ did address the evidence in the record

15 regarding plaintiff's back impairment and chronic pain syndrome as follows:

16     With regard to the back impairment and/or chronic pain syndrome, I note that there is
       little objective evidence of spine abnormalities.  In November 1995 an MRI study
17     revealed degenerative desiccation of the L4-5 disc with minimal posterior bulge (Exhibit
       22/5).  On IME in August 1996 the claimant was assessed with a Category I impairment.
18     His examination was notable for non-physiologic sensory findings (Exhibit 40).  Dr.
       Frankel frequently described the claimant as appearing comfortable, even as he
19     complained of high pain levels (8 out of 10).  Her examination findings do not support
       the degree of limitation and pain alleged by the claimant.
20
21 Tr. 23.  Accordingly, in terms of plaintiff's physical limitations, the ALJ found he could "perform light work

22 activity with a sit/stand option every hour," and "lift/carry 20 pounds occasionally and 10 pounds

23 frequently." Id.  The undersigned finds no error here.

24     The substantial evidence in the record concerning plaintiff's back impairment and chronic pain

25 syndrome supports the ALJ's findings on this issue.  First, though, the undersigned must address plaintiff's

26 contention that as his treating physician, Dr. Frankel's disability opinion is entitled to more weight than

27 those from other medical sources in the record.  At the time Dr. Frankel provided the evaluation which was

28 the basis for her opinion, she was not acting as plaintiff's treating physician and had only seen him that one

time. Tr. 235, 249.  It was not until mid-May 1999, apparently, that Dr. Frankel began treating plaintiff. Tr.

270.  Thus, for the purpose of determining whether the ALJ erred in rejecting her mid-March 1997 opinion, Dr. Frankel more properly should be viewed as an examining consulting physician.

A.     Dr. Frankel's Opinion Is Inconsistent with the Other Medical Evidence in the Record

Dr. Frankel's disability opinion is contradicted by the findings of the other medical sources in the record who saw and treated plaintiff up until that point in time.  In late March 1993, plaintiff visited the emergency room complaining of pain in his lower back. Tr. 88.  He denied "shooting pain down his leg," numbness, tingling or achiness. Id.  The examining physician at the time found plaintiff to be "in really minimal distress," and the physical examination findings essentially confirmed this. Id.  Plaintiff was given two days off work and told not to do any heavy lifting for one week. Id.

In late June 1994, plaintiff's treating physician at the time, Dr. Roger D. Olsen, diagnosed him as having stress and tension headaches. Tr. 100.  Plaintiff, however, otherwise denied any health problems. Id. In early August 2005, Dr. Olson found plaintiff's lumbar spine x-rays to be "unremarkable." Tr. 99.  He diagnosed plaintiff with an "[o]ld back strain with exacerbation," and "[p]robable sciatica." Id.  Plaintiff reported his back was "doing somewhat better" later that month, stating that physical therapy seemed to be helping. Id.  Dr. Olson found tenderness in the right posterior pelvis area, and diagnosed "[m]uscular pain, right lower back." Id.  In early September 1995, plaintiff appeared to experience an exacerbation in his symptoms, reporting that pain medication and physical therapy had not been helpful. Tr. 99.  Dr. Olson was not sure whether his back pain was truly sciatica or a mechanical problem. Tr. 139.

In late October 1995, plaintiff was examined by Dr. Jospeh C. Novak, an orthopoedic specialist. Tr. 92.  On examination, plaintiff was able to stand and bear his weight equally in both lower extremities. Tr. 93.  He had no limp with gait, showed good strength with squatting, and had normal heal and toe walking. Id.  Dr. Novak saw no deformities in the curvature of plaintiff's lumbar spine. Id.  While plaintiff reported low back pain with flexing, pain with rotation, and pain and discomfort with straight leg raising, there was no tenderness to palpation over the lumbar spine area, deep tendon reflexes were symmetrical, and strength and sensation in the lower extremities were both intact. Tr. 93-94.  Examinations of plaintiff's cervical spine and hips also were normal. Tr. 94.  As with Dr. Olson, Dr. Novak found recent x-rays of plaintiff's lumbosacral spine to be unremarkable. Tr. 91, 94.  Dr. Novak thus found plaintiff had a lumbar strain and chronic low back pain, and concluded in relevant part as follows:

1   There is some referral into his right lower extremity but his examination does not point
2   to any serious nerve root compression problem, although it is possible that his injury did
    result in a lumbar disc injury at the time of his accident.  His positive findings are largely
3   the subjective complaints as noted in the body of his history and the limited range of
    motion of his back as noted on physical examination.  At this point in time I think his
4   back condition is medically stable. . . . There are no strong objective findings of physical
    impairment and his findings do not correlate well with the severity of his complaints.

5   Id.

6           In early December 1995, Dr. Olsen signed a letter stating that he agreed with Dr. Novak's findings.

7   Tr. 132.  Dr. Olsen wrote another letter later that month stating that plaintiff had been unable to work. Tr.

8   97.  In that letter, however, Dr. Olsen further stated that this was so "largely due to subjective complaints of

9   low back pain," and he was not able to comment on whether those symptoms would continue. Id.  He thus

10  felt further evaluation was needed by way of an MRI and either a neurological examination or follow-up

11  with Dr. Novak. Tr. 97.

12          In mid-January 1996, Dr. J. Dalton, a non-examining consulting physician, found plaintiff to be

13  capable of performing light work, with certain postural limitations, based on his review of the record. Tr.

14  31-34.  Specifically, plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand

15  and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. Tr.

16  31.  He had no manipulative limitations and was unlimited in his ability to push and or pull, but could only

17  occasionally climb, balance, stoop, kneel, crouch, or crawl. Tr. 31-33.  These findings were confirmed by

18  two other non-examining physicians in mid-March 1996, and late January 1999. Tr. 37.

19          Plaintiff was examined by Dr. Guy H. Earle in early March 1996.  Plaintiff reported that he had no

20  leg numbness or weakness, and that he was not taking any medication currently. Tr. 102.  On examination,

21  plaintiff was found to be in no acute distress. Id.  He had "some stiff guarded movement," "tense, tender

22  lumbar paraspinals," and somewhat tense and tender sacroiliac joints and gluteal muscles. Id.  Neurological

23  examination of plaintiff's lower extremities, however, showed "no obvious areas of atrophy or loss of

24  sensation." Tr. 103.  Plaintiff's deep tendon reflexes were equal and his strength appeared to be intact as

25  well. Id.  He was assessed with a "chronic lumbar strain, with pain most likely on the basis of chronic

26  mechanical back pain," degenerative disc disease, "[m]yofascial pain syndrome with evidence of muscle

27  spasm," and "abnormal motion of the spine." Id.  Dr. Earle did not consider plaintiff to be fixed and stable

28  or to have reached "maximum medical improvement." Id.

            Plaintiff was examined by Dr. Mark D. Holmes, an orthopedic surgeon, and David L. Green, a

1  neurologist, in early August 1996.  Plaintiff reported he was not currently taking any pain medications.  Tr.

2  194.  Drs. Holmes and Green found no abnormal curvatures in his spine.  Tr. 196.  Although plaintiff had

3  "slight tenderness without significant muscle spasm" in his paravertebral musculature, straight leg raising

4  was "essentially negative" and there was "full range of motion" in his hips, knees and ankles.  Id.  He had

5  "normal" muscle mass, tone and strength, with "no abnormal movements" present.  Tr. 197.  While plaintiff

6  did have some loss of sensation in his right lower extremity, his coordination, reflexes and gait were all

7  intact.  Id.  Again, his prior x-rays were notable for "no significant abnormalities."  Id.  He was diagnosed as

8  having "lumbosacral strain without any significant evidence of degenerative disc disease of the lumbar

9  spine."  Tr. 198.  Plaintiff thus was deemed to be "medically fixed and stable," with "no additional medical

10  treatment" indicated.  Id.

11          The weight of the medical evidence in the record up until the time of the evaluation performed by

12  Dr. Frankel in mid-March 1997, therefore, indicates that plaintiff's back impairment and chronic pain

13  syndrome were far from disabling.  At most, there may be some ambiguity in that evidence as to plaintiff's

14  medical stability.  Resolving such ambiguities, however, are solely the responsibility of the ALJ.  Reddick,

15  157 F.3d at 722; Sample v. Schweiker, 694 F.2d at 642.  Dr. Frankel did opine that based on her findings,

16  plaintiff's self-reports, and her review of the prior medical evidence, she felt that plaintiff's condition had

17  worsened.  Tr. 130, 243.  Specifically, Dr. Frankel relied on the findings of Dr. Olsen.  As discussed above

18  though, Dr. Olsen concurred with Dr. Novak's report that plaintiff was medically stable.  In addition, as

19  explained below, the ALJ did not err in finding plaintiff less than fully credible.  In any event, based on the

20  record before her, it was not improper for the ALJ to find Dr. Frankel's opinion was inconsistent with the

21  other medical evidence in the record See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (where opinion

22  of examining physician is based on independent clinical findings, it is within ALJ's discretion to disregard

23  conflicting opinion in another examining physician's diagnosis).

24          B.      Dr. Frankel's Subsequent Treatment Notes

25          Dr. Frankel's own subsequent diagnostic and clinical notes during the time when she was treating

26  plaintiff, furthermore, fail to support her prior opinion of disability.  In mid-May 1999, Dr. Frankel found

27  tenderness to palpation in plaintiff's low back, "causing him to jump from pain."  Tr. 273.  He also had

28  "[m]arkedly limited" range of motion in that area, associated with pain, and decreased range of motion in

1     his left hip. <u>Id.</u>  However, his coordination, sensation, strength and deep tendon reflexes were essentially

2     intact. <u>Id.</u>  Plaintiff's extremities were intact as well, with negative straight leg raising, and he had full range

3     of motion in his shoulders. <u>Id.</u>  In early June 1999, plaintiff reported medication "dulled the pain." Tr. 269.

4     Dr. Frankel diagnosed him as having an antalgic gait on the left. <u>Id.</u>

5         In early July 1999, however, plaintiff reported that "[o]verall" his pain level was "improved" with

6     "regular pain pills." Tr. 268.  Dr. Frankel noted he appeared to be "comfortable." <u>Id.</u>  In late July and early

7     August 1999, plaintiff again was noted to be "comfortable." Tr. 264-65.  In late August 1999, plaintiff told

8     Dr. Frankel that he walked "about a mile once a day." Tr. 262.  Again, he appeared "comfortable," with no

9     pain behaviors. <u>Id.</u>  Dr. Frankel found him to be on a "stable level of pain medication." Tr. 263.  In mid-

10    September 1999, plaintiff was comfortable, had no pain behaviors, was able to do heel and toe and tandem

11    walking, his deep tendon reflexes were equal, and, although he had "some relative" trunk weakness, was

12    able to demonstrate functional strength. Tr. 260.  His sensation was intact as well. <u>Id.</u>  While Dr. Frankel

13    stated that plaintiff's chronic pain syndrome continued to be "problematic," she further noted he remained

14    on a stable level of pain medication. <u>Id.</u>

15         In late September 1999, plaintiff reported feeling "pretty good," and he appeared to be comfortable

16    on examination. Tr. 259.  Once more, Dr. Frankel stated plaintiff was on a stable level of pain medication.

17    <u>Id.</u>  Findings substantially similar to those obtained in mid-September 1999, also were made the following

18    month, and through late May 2000. Tr. 253-57, 343.  In early January 2000, plaintiff had reported walking

19    "about ½ mile a day overall." Tr. 256.  Although plaintiff appeared to experience an exacerbation in his

20    symptoms during the period of late June through late September 2000, those symptoms seemed to have

21    improved by mid-December 2000. Tr. 337-42, 380, 384-85.

22         Indeed, plaintiff appeared comfortable by the end of the year, noting only "some intermittent back

23    pain, primarily with sitting," which Dr. Frankel felt could "reflect some postural/mechanical dysfunction in

24    response to" stretching exercises he was doing. Tr. 380.  In mid-January 2001, Dr. Frankel found plaintiff's

25    pain control to be "stable." Tr. 379.  In early February 2001, plaintiff reported that his right hip problem had

26    "resolved in response to the exercises he was given." Tr. 336.  He also reported that he planned "to walk

27    more" as the weather improved. <u>Id.</u>  Dr. Frankel advised plaintiff that he seemed "sufficiently stable" that he

28    could try to move his doctor visits to every two months. <u>Id.</u>

1        In late March 2001, plaintiff reported that he was "starting to do more walking and as a result of

2   this" was "beginning to feel a bit better also." Tr. 335.  He was in no acute distress, and his examination

3   was fairly unremarkable. Id.  Dr. Frankel found both plaintiff and his pain control to be stable, and did not

4   recommend any changes in his treatment for chronic pain. Id.  She further noted that he was "beginning to

5   do some regular exercise and seeing good results with that." Id.  Again, Dr. Frankel advised plaintiff that he

6   seemed "sufficiently stable" that he could "continue less frequent visits." Id.  In late May 2001, when it

7   appears Dr. Frankel last saw plaintiff, she once more noted plaintiff's stability, stating there was "nothing to

8   indicate need for reevaluation at this time" or for any changes in the treatment of his chronic pain. Tr. 334.

9   Thus, it appears plaintiff has substantially improved in terms of his back problems since Dr. Frankel found

10  him disabled in mid-March 1997.  As such, the undersigned does not find the ALJ's evaluation of the

11  medical evidence in the record regarding those problems to have been improper.

12  II.    The ALJ Erred In Assessing Plaintiff's Residual Functional Capacity

13       To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step

14  sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920.  If a disability determination "cannot be

15  made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify

16  the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-

17  related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is

18  used at step four to determine whether he or she can do his or her past relevant work, and at step five to

19  determine whether he or she can do other work. Id.  Residual functional capacity thus is what the claimant

20  "can still do despite his or her limitations." Id.

21       A claimant's residual functional capacity is the maximum amount of work the claimant is able to

22  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

23  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

24  limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

25  claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

26  related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

27  medical or other evidence." Id. at *7.

28       The ALJ found plaintiff capable of performing "light work activity with a sit/stand option every

1   hour," of lifting/carrying "20 pounds occasionally and 10 pounds frequently," and of performing repetitive

2   tasks "in a low-stress environment." Tr. 23.  Plaintiff argues, however, that in assessing him with this

3   residual functional capacity, the ALJ erred in evaluating the medical evidence in the record, and thus did not

4   properly consider all of his mental functional limitations.  The undersigned agrees.

5          Plaintiff was evaluated by Glade Birch, Ph.D., in late November 1999.  Dr. Birch found plaintiff to

6   be cooperative, but with a "defensive and restrictive" affect. Tr. 204.  He denied having any delusions or

7   being suicidal or homicidal. Id.  While plaintiff was oriented, his stream of mental activity was notable for

8   "vague and circumstantial characteristics to and poverty of speech." Id.  He also demonstrated problems

9   with memory, fund of knowledge, concentration, abstract thinking, insight and judgment. Tr. 204-05.  Dr.

10  Birch further felt that his history of past work and his current diagnosis could "indicate both deterioration

11  and decompensation in [his] mental/emotional condition." Tr. 206.

12         Plaintiff's profile indicated that he was "experiencing memory and concentration problems," and was

13  a high risk for suicide. Tr. 206-07.  His clinical scales also indicated depression. Tr. 207.  In addition, Dr.

14  Birch commented as follows:

15         Claimant's profile indicates he is experiencing serious psychopathology including
           confused, distorted perceptions and psychotic processes.  He is having difficulty with
16         logic, concentration and judgment and the profile indicates a thought disorder.

17  Id.  He diagnosed plaintiff with a schizotypal personality disorder and a global assessment of functioning

18  ("GAF") score of 50. Id.  In terms of prognosis, Dr. Birch concluded:

19         Schizotypal Personality Disorder has a poor record in therapy; this claimant has a
           lifelong history of the disorder and is not a good prospect for treatment.  His condition
20         makes acceptance of social contact unlikely, and the outlook for recovery and normal
           function is bleak.
21
22  Id.

23         Based on this evaluation, Dr. Birth found plaintiff had a "fair" ability (defined as "seriously limited,

24  but not precluded") to: interact with supervisors, deal with work stresses, understand, remember and carry

25  out complex job instructions,[2] and behave in an emotionally stable manner. Tr. 211-12.  He further found

26  plaintiff had a "poor" or no ability (defined as "[n]o useful ability to function in this area") to relate to co-

27         [2]Dr. Birch did not mark this category on the form he used. Tr. 212.  However, he marked both "fair" and "unlimited/very
    good" for the mental functional category directly below it, the ability to understand, remember and carry out detailed, but not
28  complex, instructions. Id.  Since complex tasks in general are harder to do than detailed ones, it is likely Dr. Birch meant the
    "fair" designation to apply to the ability to understand, remember and carry out complex job instructions.

REPORT AND RECOMMENDATION
Page - 11

1   workers. Tr. 211-12.  Lastly, Dr. Birch stated plaintiff's "isolation and personality disorder characteristics

2   will limit all activities." Tr. 212.

3          Plaintiff was evaluated again in late July 2002, by Paul C. Daley, Ph.D.  Dr. Daley found plaintiff's

4   attidude to be "bitchy" toward authorities in general, though he was not difficult to manage. Tr. 347.  He

5   was alert and his eye contact was fair. Tr. 347-48.  Plaintiff denied being suicidal or homicidal or having

6   delusional beliefs, but implied that he had hallucinations. Id.  His speech was "mildly impoverished," and he

7   was "poorly oriented." Tr. 348.  Plaintiff showed no tangentiality or circumstantiality, but his responses

8   were slow and prone to error. Id.  Dr. Daley diagnosed him with a personality disorder, "with paranoid,

9   schizoid, histrionic, narcissistic, dependent, depressive, and obsessive-compulsive features," provisional

10  borderline intellectual functioning, and a GAF score of 31. Tr. 349.  Overall, Dr. Daley felt that there was

11  "something not right with his brain functioning, over and beyond that which might be explainable on the

12  basis of his personality disorder." Id.

13         In terms of mental functional limitations, Dr. Daley found plaintiff moderately limited (defined as

14  being a moderately limited, but "still able to function satisfactorily") in his ability to understand, remember

15  and carry out detailed instructions, and interact appropriately with co-workers, supervisors and the public.

16  Tr. 352-53.  He was moderately to markedly limited (markedly limited defined as being "severely limited but

17  not precluded") in his ability to respond appropriately to work pressures in a usual work setting. Id.

18  Plaintiff also was markedly limited in his ability to make judgments on simple work-related decisions and

19  respond appropriately to changes in a routine work setting. Tr. Id.

20         At the hearing, Dr. Norman Gufstason, the medical expert, testified that, based on his review of the

21  record, he felt that plaintiff had a "pain disorder with psychological factors affecting a general medical

22  condition," a dependent personality disorder, and a GAF score "closer to 50." Tr. 422-23.  With respect to

23  mental functional limitations, he testified that plaintiff would have a fair to good ability to relate to co-

24  workers and deal with the public, but only a fair ability to: interact with supervisors, deal with work stress,

25  function independently, maintain concentration and attention, use judgment, understand, remember and

26  carry out detailed and complex job instructions, behave in an emotionally stable manner, and demonstrate

27  reliability. Tr. 422, 426-27.

28         Dr. Gufstason further opined that plaintiff was moderately impaired in his activities of daily living,

1    social functioning, and concentration, persistence and pace. Tr. 424-25.  However, he saw no evidence of

2    decompensation. Tr. 425.  On the other hand, he felt plaintiff's mental functioning had worsened during the

3    time between Dr. Birch's evaluation and that of Dr. Daley, and that he would need a "relatively low stress,

4    relatively stable work environment," with "[n]ot much change." Tr. 424, 426.

5        The ALJ rejected the opinions of Dr. Birch and Dr. Daley largely on the basis of Dr. Gufstason's

6    testimony, finding specifically in relevant part as follows:

7        I accept the opinion of the medical expert regarding the claimant's functional limitations.
         In so concluding, I note that Dr. Gustavson [sic] had the benefit of a full review of the
8        documentary evidence, in addition to observing the claimant at [the] hearing.  I also
         noted that the claimant's testimony at [the] hearing was consistent with Dr. Gustavson's
9        [sic] assessed limitations and that his activities are not as restricted as suggested by the
         reports from Dr. Daley and Dr. Birch.  For these reasons, I give greater evidentiary
10       weight to Dr. Gustavson's [sic] testimony than to the opinions of Dr. Daley and Dr.
         Birch.

11   Tr. 22-23 (internal footnote omitted).  The medical evidence in the record concerning plaintiff's mental

12   impairments, however, essentially consist of the opinions of Drs. Birch and Daley.  The only limitations the

13   ALJ adopted from Dr. Gufstason, furthermore, were the limitations on repetitive tasks and a low stress

14   environment. Tr. 23.  Dr. Gufstason though, found plaintiff to be limited in a number of mental functional

15   areas, many of which were as or even more restrictive than those found by Dr. Daley and Dr. Birch.  The

16   ALJ also does not explain how plaintiff's testimony is consistent with Dr. Gufstason's limitations or how his

17   activities are greater than those found by Dr. Daley and Dr. Birch, and, in any event, as noted above, the

18   limitations found by Dr. Gufstason are for the most part greater than or equal to those found by both of the

19   examining psychologists in the record.  Accordingly, the undersigned finds the ALJ erred in evaluating the

20   medical evidence in the record regarding plaintiff's mental functional limitations.

21   III.    The ALJ Properly Evaluated Plaintiff's Credibility

22       Questions of credibility are solely within the control of the ALJ.  Sample, 694 F.2d at 642.  The

23   court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the

24   court may not reverse a credibility determination where that determination is based on contradictory or

25   ambiguous evidence. Id. at 579.  That some of the reasons for discrediting a claimant's testimony should

26   properly be discounted does not render the ALJ's determination invalid, as long as that determination is

27   supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

28       To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

REPORT AND RECOMMENDATION
Page - 13

1   disbelief." Lester, 81 F.3d at 834 (9th Cir. 1996).  The ALJ "must identify what testimony is not credible and

2   what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d

3   915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons

4   for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence

5   as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

6

7         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

8   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

9   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

10  also may consider a claimant's work record and observations of physicians and other third parties regarding

11  the nature, onset, duration, and frequency of symptoms. Id.

12        The ALJ discounted plaintiff's credibility in part due to inconsistencies between his allegations of

13  disabling symptoms and the objective medical evidence in the record. Tr. 23.  A determination that a

14  claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing

15  requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  As discussed

16  above, the ALJ did not err in rejecting the opinion of Dr. Frankel that plaintiff was disabled due to his back

17  impairment and chronic pain syndrome.  As such, the ALJ did not err in discounting plaintiff's credibility

18  regarding his physical impairments for this reason.

19        Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a

20  finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain

21  testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  see also Meanal v. Apfel, 172 F.3d 1111,

22  1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to

23  request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428,

24  1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be

25  suggestive of lower level of pain and functional limitation).

26        Here, the ALJ noted that plaintiff testified that surgery had "not been recommended," and that his

27  back condition was being "treated with medications." Tr. 22.  Indeed, the record indicates that at most only

28  conservative treatment measures have been recommended for plaintiff, and that he has shown improvement

REPORT AND RECOMMENDATION
Page - 14

on pain medications. Tr. 88, 91, 94, 97, 99-100, 103, 139, 198, 213. Even Dr. Frankel, with respect to the period during which she treated plaintiff, never recommended more aggressive treatment. Tr. 253-54, 258-59, 261, 263-65, 267-69, 334-36, 338, 340, 342-44, 379, 381, 384-85. Therefore, even though plaintiff lacked the necessary funds to pursue all of the treatment options recommended to him, those options were all fairly conservative in nature.

Finally, the ALJ discounted plaintiff's credibility in part due to his activities of daily living, which the ALJ noted to include washing dishes, reading, listening to music, taking his wife shopping, and hobbies involving radio-controlled cars and ceremonial Indian headdresses. Tr. 22. To determine if a claimant's symptom testimony is credible, the ALJ also may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant, however, need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues the record fails to show his activities of daily living were not sufficient to undercut his credibility. The evidence concerning those activities is mixed. Plaintiff testified and reported that his activities of daily living were minimal. Tr. 73-74, 86-87, 412-14. For example, plaintiff testified that he did not do the laundry or any of the housework. Tr. 412-13. However, he testified that he went shopping with his wife, although he did not lift anything heavy. Id. He also told Dr. Daley that he sometimes went to the store with his mother-in-law or took her to the doctor, and that he and his wife shared the cooking. Tr. 348. When asked why he did not do the laundry, plaintiff stated that he did "not know how to separate the colors from the whites." Id. As discussed above, furthermore, he reported walking daily from between one-half to one mile per day. In addition, plaintiff told Dr. Daley that he spent much of the night pacing and walking. Tr. 347-48.

While it seems plaintiff has engaged in activities of living at a level greater than one might expect for someone claiming total disability, it is not clear from the record that he spends a substantial part of his day performing household chores or other activities that are transferable to a work setting. Nevertheless, the fact that one of the reasons for discounting his credibility should be discounted, does not render the ALJ's credibility determination invalid, as long as that determination is supported by substantial evidence.

1  Tonapetyan, 242 F.3d at 1148.  Here, two of the three reasons the ALJ provided for discounting plaintiff's

2  credibility were valid.  As such, the ALJ's credibility determination was proper.

3  IV.     The Vocational Expert's Testimony Is Unreliable

4          An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

5  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

6  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

7  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

8  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

9  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

10 description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

11 (because ALJ included all limitations that he found to exist, and those findings were supported by

12 substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

13         The ALJ posed a hypothetical question to the vocational expert that contained essentially the same

14 limitations as he included in his assessment of plaintiff's residual functional capacity. Tr. 429.  In response

15 to that question, the vocational expert testified that while plaintiff was incapable of returning to his past

16 relevant work, he could perform other jobs existing in significant numbers in the national economy. Tr. 429-

17 32.  Based on the testimony of the vocational expert, the ALJ found plaintiff not disabled at step five of the

18 disability evaluation process. Tr. 24.

19         Plaintiff argues the vocational expert's testimony is not reliable, because the ALJ did not include in

20 the hypothetical question the findings of Dr. Gufstason that plaintiff had only a fair ability to demonstrate

21 reliability, deal with stress, behave in a stable manner, use judgment, and interact with supervisors.  It is

22 true, as discussed above, that the ALJ erred in evaluating the medical evidence in the record concerning

23 plaintiff's mental functional limitations, and that, for this reason, neither the residual functional capacity

24 assessment nor the hypothetical question posed to the vocational expert are reliable.  However, it is not

25 clear that the ALJ was required to adopt the limitations found by Dr. Gufstason.

26         For example, while the ALJ concurred with Dr. Gufstason's testimony, he appeared to be relying

27 primarily on that portion of his testimony that found plaintiff to be moderately limited in his activities of

28 daily living, social functioning, and concentration, persistence and pace. Tr. 22.  Thus, the ALJ did not deal

1  with the other specific limitations found by Dr. Gufstason.  In addition, not all of the limitations found by

2  Dr. Gufstason are consistent with those found by the two examining physicians in the record, Dr. Birch and

3  Dr. Daley, which the undersigned found the ALJ failed to properly consider as well.

4       For these reasons, the undersigned does not find that plaintiff is necessarily disabled based on the

5  testimony of the vocational expert that plaintiff would not be retained by any employer if he were not able

6  to maintain production or have reliable attendance. Tr. 435.  While it is true Dr. Gufstason found plaintiff to

7  have only a fair ability to demonstrate reliability (Tr. 427), Dr. Birch found he had a "good" (defined as

8  "limited but sedentary") ability to do so (Tr. 211).  Similarly, although Dr. Gufstason again found plaintiff

9  to have only a fair ability to function independently (Tr. 422), Dr. Birch once more thought his ability in this

10  area was good (Tr. 211).  Accordingly, questions still remain regarding this issue.

11  V.    This Case Should Be Remanded for Further Administrative Proceedings

12       The court may remand a case "either for additional evidence and findings or to award benefits."

13  Smolen, 80 F.3d at 1292.  Benefits may be awarded where "the record has been fully developed" and

14  "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d

15  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

16       (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
         evidence, (2) there are no outstanding issues that must be resolved before a
17       determination of disability can be made, and (3) it is clear from the record that the ALJ
         would be required to find the claimant disabled were such evidence credited.
18
   Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because
19
   issues still remain with respect to plaintiff's residual functional capacity and whether he is able to perform
20
   other jobs existing in significant numbers in the national economy, this matter should be remanded to the
21
   Commissioner for further administrative proceedings in accordance with the findings contained herein.
22
                                   CONCLUSION
23
        Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was
24
   not disabled, and should remand this matter to the Commissioner for further administrative proceedings.
25
        Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),
26
   the parties shall have ten (10) days from service of this Report and Recommendation to file written
27
   objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those
28
   objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

1  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 2,**

2  **2005**, as noted in the caption.

3        DATED this 7th day of November, 2005.

4

5

6

7  Karen L. Strombom

8  United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 18